# United States Court of Appeals
## For the First Circuit

No. 04-2551

GRANITE STATE CONCRETE CO., INC.;
MILFORD BENNINGTON RAILROAD CO., INC.,
Petitioners,

v.

SURFACE TRANSPORTATION BOARD,
Respondent.

BOSTON AND MAINE CORPORATION;
SPRINGFIELD TERMINAL RAILWAY COMPANY,
Intervenors.

ON PETITION FOR REVIEW OF AN ORDER OF
THE SURFACE TRANSPORTATION BOARD

Before
Selya, Circuit Judge,
Hill,* Senior Circuit Judge,
and Lynch, Circuit Judge.

James E. Howard for petitioners.
Jamie P. Rennert, Attorney, Surface Transportation Board, with whom R. Hewitt Pate, Assistant Attorney General, Makan Delrahim, Deputy Assistant Attorney General, Robert B. Nicholson, Attorney, Department of Justice, John P. Fonte, Attorney, Department of Justice, Ellen D. Hanson, General Counsel, and Craig M. Keats, Deputy General Counsel, were on brief, for respondent.
Eric L. Hirschhorn, with whom Winston & Strawn LLP and Robert B. Culliford, Guilford Rail System, were on brief, for intervenors.

July 29, 2005

*Of the Eleventh Circuit, sitting by designation.

**LYNCH**, **Circuit Judge**. At issue is an order of the Surface Transportation Board (STB) finding that one railroad acted reasonably in light of rail safety concerns when it imposed restrictions upon another railroad operating on its lines.

The petitioners in this case are the railroad subjected to restrictions, the Milford-Bennington Railroad Company (MBRR), and its only customer, the Granite State Concrete Company (Granite State). The respondent is the STB. The intervenors are the other railroad which imposed those restrictions, the Boston and Maine Corporation, and Springfield Terminal Railway Company, two subsidiaries of Guilford Transportation Industries (collectively referred to as "Guilford").

MBRR petitions for review of the STB's final order, which rejected MBRR's claims 1) that Guilford unreasonably interfered with MBRR's ability to service Granite State in violation of 49 U.S.C. § 10702, and 2) that Guilford failed to meet its own service obligation to MBRR, in violation of 49 U.S.C. § 11101. The STB found that restrictions were indeed imposed by Guilford but were not unreasonable given safety concerns and the information available to Guilford, and that Guilford did not fail to meet its service obligations. Granite State Concrete Co., STB Docket No. 42083, 2004 WL 2138195 (served September 24, 2004) (Granite State II).

To prevail, MBRR must convince us that the STB's findings and conclusions were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2).  We summarize MBRR's arguments and our responses.  MBRR argues that there were no plausible safety issues (untrue on the face of the record); that the STB was required to ask another agency to determine if there were any safety issues (not so); that the STB failed to follow its own precedents (none were binding or even applicable); that the STB's exuberant language in its order establishes that the STB abandoned its usual reasonableness standard of review for a new ad hoc "not necessarily unreasonable/not so egregious" standard of review (while the STB should be more precise, it did not apply the wrong standard of review); that the STB ignored relevant facts (we are unconvinced); and that the STB, having found petitioners had been harmed, was required as a matter of law to award damages (there is no such requirement).  The STB order was far from arbitrary or capricious; it was a sensible resolution of the case before it.

## I.

We recount the facts as found by the STB and shown by the record.

Guilford[1] owns the first 16.36 miles of a 34.9-mile rail line running northwest from Nashua to Bennington, New Hampshire. The other section of the line -- miles 16.36 to 34.9 -- is owned by the state of New Hampshire and leased by petitioner MBRR.

Petitioner Granite State operates a stone quarry north of Wilton, New Hampshire, and a stone processing center located several miles to the south, in Milford, New Hampshire. Both communities lie along the rail line. MBRR transports Granite State's crushed stone from the Wilton quarry to the Milford processing center; indeed, MBRR's only shipping customer is Granite State. The first part of the shipping route lies on MBRR's section of the line. The last three miles of the route, approximately, is on Guilford's portion of the track. In order to serve Granite State, MBRR has trackage rights which permit it to use Guilford's line to finish the journey to Milford.

The problem here started with MBRR's decision in 2002 to contract with a scenic railroad, Wilton Scenic Railroad (Wilton Scenic), to run sight-seeing passenger trains over its own tracks adjacent to the Guilford line. Those operations began on May 17, 2003. Even before these operations started, Guilford and MBRR were at odds about them. As the STB found:

> Wilton Scenic uses passenger cars that are
> stored on [MBRR] track near the point where

---

[1]Only two subsidiaries of Guilford Transportation Industries are named parties before the STB and this court.

the [MBRR] line and the [Guilford] line connect. At that point, there is a steep downhill grade that continues over the length of the [Guilford] track. The existence of this grade, along with the presence of Wilton Scenic's passenger equipment, apparently raised safety concerns for [Guilford]. After [Guilford] and [MBRR] failed to reach a meeting of the minds about how to deal with those concerns, [Guilford] installed a "derailment device," first on the [MBRR] side of the point where the lines connect and subsequently, after [MBRR] allegedly refused to activate the first derailment device, on the [Guilford] side of the point of connection. The derailment device has the effect of requiring [MBRR] to stop its trains before they move onto [Guilford]'s line.

Granite State II, 2004 WL 2138195, at *1.[2]

Both sides had problems. Guilford, having examined the site more closely, had concerns that the Wilton Scenic cars or freight cars could break free and roll down the .75 to 1.5% downhill grade on the track leading into the MBRR/Guilford junction onto its tracks and cause injury and damage. After all, MBRR did not continuously monitor the site and there had been an earlier incident of a trespasser on MBRR's tracks causing an accident with a small rail inspection car which had resulted in serious injury.

---

[2]When a derail device is turned "on" or "closed," it causes railroad cars passing over it to leave the tracks and derail. If it is turned "off" or "opened," it has no effect on passing trains. The basic idea in closing the derail device at the junction of the MBRR and Guilford lines is to separate the two systems so that trains from one system cannot enter the tracks of the other without first stopping to open the derail device.

-5-

MBRR also had a problem because the derailment device required its train to stop, and the engineer to get out to trip and reset the device each time the train passed over it. This in turn slowed down the schedule,[3] and this was an important issue because Granite State had been given only limited hours to operate by the town of Wilton.[4] Further, Wilton Scenic thought the continued use of the derailment device would be infeasible once it expanded its operations from the weekends to weekdays, as it planned to do. It appears that MBRR engaged in some self-help: MBRR left the device open when its freight trains were running and sometimes even removed this derail device without notifying Guilford. Guilford first discovered that the derail device was not being used properly on June 19, 2003, when Guilford conducted an inspection of the MBRR/Guilford intersection in response to Wilton Scenic's request for all three carriers to meet and come up with a plan to resolve safety concerns.

Given MBRR's refusal to keep or use the derail device on the MBRR side of the intersection (and its refusal to tell Guilford), Guilford decided that to ensure safe operation, it

_____

[3]MBRR claimed that in recent years, as the physical conditions on the Guilford line deteriorated, the speed limit was reduced from ten miles per hour to five miles per hour, making further delays costly.

[4]Granite State uses a rock crushing machine at the Wilton site. Due to noise, the town of Wilton limited its hours of operation to between 6:30 a.m. and 6:30 p.m. on weekdays.

needed to completely separate the operations of MBRR and Guilford over the Guilford line. It implemented a number of measures to accomplish this goal. Only one -- a limited time window for MBRR's use of Guilford's line -- is the focus of the petitioners' arguments to this court.

Starting on June 20, 2003, MBRR was given the window from 1 a.m. to 8 a.m. each day to operate its trains.[5] Guilford explains that the nighttime window for MBRR was designed to make sure MBRR and Guilford trains and maintenance crews were never on Guilford's tracks at the same time and to allow Guilford, the owner of the track, to inspect and maintain the tracks during the day.

This operating window, combined with the hours limitation on the Granite State quarry, reduced MBRR's service to only one trip a day. MBRR believed that it could not operate its trains at the Granite State quarry outside the quarry's normal operating hours. Guilford was not initially aware of the permitting restrictions on Granite State and, in any case, did not understand that MBRR could not operate outside Granite State's operating hours.

On June 27, 2003, MBRR and Granite State requested informal assistance from the STB's Office of Compliance and Enforcement in resolving this dispute. MBRR explained that the

---

[5]Some parts of the record indicate that the window was from midnight to 8 a.m. This discrepancy ultimately makes no difference to the resolution of the case.

operating window was preventing it from effectively serving Granite State (though service never ceased). Guilford disputed this claim and offered to temporarily serve Granite State itself, pending resolution of the dispute, based on the STB's determination of "reasonable terms and conditions" for service. Granite State and MBRR refused Guilford's offer.[6]

Once MBRR made clear why the 1 a.m. to 8 a.m. operating window caused it difficulty in serving Granite State, Guilford, on July 8, offered to change the operating window to between 4 a.m. and 1 p.m. Guilford explained that this new window should allow MBRR to make more round trips between the two Granite State facilities each day, give Guilford enough time to serve its customers, and still keep the operations of the two railroads separate to address its safety concerns. On July 11, Guilford informed MBRR that the new operating window from 4 a.m. to 1 p.m. would go into effect starting July 15, 2003. MBRR concedes that the new window allowed MBRR to complete two round trips on most days.

---

[6]In addition, MBRR claimed in its statements to the STB that it had performed repairs on Guilford's tracks over the years due to their poor condition. Guilford pointed out that if these repairs were performed as MBRR claimed, they were unauthorized, and, because Guilford was not informed that MBRR's crews were working on the tracks, the repairs created another safety hazard and validated Guilford's concerns that MBRR was not following safety rules and standards.

Still dissatisfied with the new window, MBRR and Granite State filed a formal complaint with the STB on July 14, 2003, claiming that Guilford's actions (poor maintenance, installation of the derail device, instituting the operating window) caused MBRR and Granite State to only be able to move a fraction of the gravel that would be moved normally, and threatened to "effectively . . . shut down" both MBRR and Granite State. MBRR and Granite State asked for an emergency service order under 49 U.S.C. § 11123 and 49 C.F.R. § 1146.1 directing Guilford to "permit [MBRR] to serve Granite State between 6:30 AM and 6:30 PM." MBRR and Granite State also argued that the time restrictions constituted an unreasonable rule or practice under 49 U.S.C. § 10702[7] and/or a breach of the duty to provide service under 49 U.S.C. § 11101[8] and asked the STB to enjoin Guilford from imposing such unreasonable time restrictions in the future. Finally, MBRR and Granite State sought damages.

The STB denied the request for an emergency service order on September 15, 2003, noting that "substantial traffic continue[d] to move." Granite State Concrete Co., STB Docket No. 42083, 2003

---

[7]In relevant part, the statute provides that "[a] rail carrier providing transportation or service . . . shall establish reasonable . . . rules and practices on matters related to that transportation or service." 49 U.S.C. § 10702.

[8]In relevant part, the statute provides that "[a] rail carrier . . . shall provide the transportation or service on reasonable request." 49 U.S.C. § 11101.

WL 22121645, at \*4, \*6 (served September 15, 2003) (Granite State I). But it also denied Guilford's motion to dismiss the complaint and scheduled further proceedings to "consider whether [Guilford] has acted to interfere unreasonably with [MBRR]'s ability to meet its common carrier obligations." Id. at \*4.

After that, Guilford took further ameliorative actions. While the new operating window was in effect, Guilford performed repairs on the tracks after MBRR was done with the line for the day, and by October 29, 2003, had successfully rehabilitated the track to increase the speed limit from five to ten miles per hour. Guilford then discontinued the operating window on November 10, 2003, and replaced it with an "absolute block" system so that only one train or maintenance crew at a time would be allowed within the relevant portion of the line. This, in effect, continued to keep the two railroads' operations completely apart.

Despite the improvements, MBRR and Granite State continued to pursue the complaint before the STB, arguing, inter alia, that Guilford's "absolute block" system was unreasonable and unnecessary. Granite State II, 2004 WL 2138195, at \*2-\*3.

On September 24, 2004, the STB rendered its final decision in this case. The STB denied MBRR's and Granite State's complaint in its entirety. In doing so, the STB framed the question before it as "whether actions taken by [Guilford] were unreasonable." Id. at \*2. It answered that question in the

negative, finding that "the complainants have not shown that the measures taken by [Guilford] to address its concerns were necessarily unreasonable." Id. It also concluded that it could not find, based on the facts in the record, that Guilford "unreasonably interfered with [MBRR]'s ability to carry out its common carrier obligation to serve Granite State." Id. at *3. The STB elaborated that "while some of [Guilford]'s actions made it more difficult for [MBRR] to provide service, its actions did not preclude rail service. In short, [MBRR] and Granite State have not shown that [Guilford]'s actions were so egregious as to warrant a finding that they violated the statute." Id.

The STB also determined that it should continue to keep tabs on the situation. "[W]hile [Guilford's] conduct toward complainants has not risen to the level of violating our statute, the record of this conduct shows that Granite State does merit immediate access to the Board's processes to protect the shipper from the risk of market power abuse. In particular, complainants should be able to seek prompt relief if [Guilford] were to impose unworkable restrictions." Id. at *4. Accordingly, the STB refused to exempt the traffic handled by MBRR for Granite State from its regulations.[9] Id.

_____

[9]Guilford had argued that the crushed rock shipping service provided by MBRR was exempted from STB's regulations under a class exemption. Granite State I, 2003 WL 22121645, at *5. Without deciding whether the exemption applied, the STB revoked the exemption to the extent necessary to allow the STB to consider the

-11-

The petitioners then timely petitioned this court for review of the STB's decision.

**II.**

Under the Administrative Procedure Act, a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). The STB's decision is not arbitrary or capricious if a "rational basis" for the decision exists in the facts on the record. See Berkshire Scenic Ry. Museum, Inc. v. ICC, 52 F.3d 378, 381 (1st Cir. 1995). We must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. . . . [But] [t]he court is not empowered to substitute its judgment for that of the agency." Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974) (quoting Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416 (1971)).

A. STB's Use of the Improper Standard

The petitioners argue that the STB applied the wrong legal standard in determining that Guilford's decision to impose an operating window for MBRR's trains was reasonable under 49 U.S.C. §§ 11101 and 10702. If that were true, we would remand the matter

merits of the dispute. Id.

-12-

to the agency and not reach the other issues, unless the error was clearly harmless.

The proof of this erroneous legal standard, the petitioners say, is in the language of the STB order itself, which said at various times that the petitioners failed to show that Guilford's actions were "necessarily unreasonable" or "so egregious" as to constitute a violation of the statute. Granite State II, 2004 WL 2138195, at *2-*3.

The correct standard, as counsel for the STB argues, is "whether a particular service is adequate[10] or a particular practice is reasonable." Guilford had a common carrier obligation under 49 U.S.C. § 11101(a) to "provide the transportation or service on reasonable request," and an obligation under 49 U.S.C. § 10702, as to MBRR's trackage rights, to "establish reasonable . . . rules and practices in matters related to that transportation or service." The two statutory provisions at issue here do not provide precise definitions for the operative standards: section 11101 does not define what would constitute adequate service on reasonable request, and section 10702 does not define what would be reasonable rules and practices. The STB has been given broad discretion to

---

[10]"Adequate service" (as opposed to just "service") is not in the language of section 11101, but it is a part of the general definition of common carrier obligations. See, e.g., Nat'l Grain and Feed Ass'n v. United States, 5 F.3d 306, 311 (8th Cir. 1993); Wales Transp., Inc. v. ICC, 728 F.2d 774, 780 n.9 (5th Cir. 1984); see also 49 U.S.C. § 11121(a)(1) ("A rail carrier . . . shall furnish safe and adequate car service. . . .").

conduct case-by-case fact-specific inquiries to give meaning to these terms, which are not self-defining, in the wide variety of factual circumstances encountered.  See, e.g., Decatur County Comm'rs v. Surface Transp. Bd., 308 F.3d 710, 716 (7th Cir. 2002) (fact-specific inquiry in determining reasonableness of embargo under section 11101); GS Roofing Prods. Co. v. Surface Transp. Bd., 143 F.3d 387, 392 (8th Cir. 1998) (same).

On the facts alleged, the questions the STB had to address under 49 U.S.C. §§ 11101 and 10702 were 1) whether Guilford had imposed restrictions on MBRR's ability to service its customer; 2) whether, under section 10702, the restrictions were unreasonable in light of the factual circumstances; and 3) whether, under section 11101, the restrictions amounted to a violation of Guilford's service obligations. As we discuss in the next section, when we review the STB's analysis, we are convinced that despite its rhetorical excess, the STB applied the correct standard.  It did say that the key question before it was "whether actions taken by [Guilford] were unreasonable." Granite State II, 2004 WL 2138195, at *2.  The STB determined that there were restrictions, but concluded that they represented a reasonable accommodation between Guilford's safety concerns and the petitioners' service needs.  Id. at *3.  The STB examined the relevant factors and grounded its decision in the record.  But we urge the STB to be more careful in its choice of language in the future.

Another argument as to incorrect standards may be quickly dispatched. The petitioners complain that the STB decision fails to cite, much less differentiate, between the two statutory sections at issue. But, since the claim alleging Guilford had failed to meet its service obligations required a showing that Guilford had unreasonably restricted petitioners' access, there was no need for separate analysis. In fact, though, the STB did deal separately with Guilford's common carrier obligation in accommodating MBRR's requests for service and found no violation. See id. And we know of no rule that an agency opinion must specifically cite the statutes at issue.

The petitioners also argue that the STB used the wrong standard because it failed to apply a balancing test, articulated in Illinois Central Gulf R.R. Co., 363 I.C.C. 690, 695 (1980),[11] for evaluating "adequacy of service." The test reads as follows:

> In determining whether a railroad has violated its duty under 49 U.S.C. 11101 to provide adequate service, we will apply a balancing test similar to the test applied in abandonment proceedings.[12] We will weigh the

---

[11]The STB was created in 1995 as a successor to the Interstate Commerce Commission (ICC). See Pejepscot Indus. Park, Inc. v. Maine Cent. R. Co., 215 F.3d 195, 197 (1st Cir. 2000). For ease of reference, we refer to the relevant agency as the "STB" throughout.

[12]Illinois Central Gulf involved the consolidation of two related proceedings: one was the abandonment application of the carrier, and the other was a complaint brought by shippers against the carrier for discontinuing its service on the line to be abandoned. 363 I.C.C. at 690. The decision explained that the balancing analysis in that case was informed by the factual

-15-

public need for service over the line at the level sought in the complaint and compare that need with the burden on the carrier and on interstate commerce of providing service at that level. In applying this test we will consider such factors as the traffic and revenue potentials of the line, the availability of alternative transportation, the condition and type of track, and the costs of putting the track into the condition necessary for the sought service and of maintaining the track in that condition. This test can be applied to any line under consideration in a complaint proceeding regardless of whether the carrier considers the line to be main line track or branch line track.

Id. The petitioners assert that this test applies to all section 11101 cases, and read alone, this language does appears to be sufficiently broad to do so.

However, as the STB's brief notes, the cases cited by the petitioners which apply this test, including Illinois Central Gulf, are all abandonment or embargo cases, which involve total cessations of service, and turn on considerations which do not govern this case. See, e.g., Bolen-Brunson-Bell, Inc., STB Finance Docket No. 34236, 2003 WL 21108185 (served May 15, 2003); Bar Ale Inc., STB Finance Docket No. 32821, 2001 WL 833717 (served July 20, 2001). There was no total cessation of service here, see Granite State II, 2004 WL 2138195, at *3 (concluding that Guilford's time

determinations and conclusions applicable to abandonment. Id. at 703.

-16-

restrictions never "preclude[d] rail service"), and the petitioners themselves concede as much.

The petitioners make much of the breadth of the language in Illinois Central Gulf, insisting that the balancing test applies to the adequacy of any specified "level" of service, including decreases in level of service short of an embargo.  However, the petitioners have not cited to us any case in which the STB did in fact apply the balancing test outside the total cessation of service context, and we see no indication that the STB is required to do so.[13]  In fact, the STB has not applied the Illinois Central Gulf test in other cases arising under section 11101.  See, e.g., Pejepscot Industrial Park, Inc., STB Finance Docket No. 33989, 2003 WL 21108198 (served May 15, 2003).  Morever, as an examination of the factors listed by the STB in Illinois Central Gulf demonstrates, the test is not primarily concerned with the reasonableness of a carrier's safety concerns or its responses to those concerns, which are the key issues here.

---

[13]The petitioners claim that Illinois Central Gulf itself is a case which applied this test outside the abandonment context. This is simply false.  As noted above, Illinois Central Gulf consolidated a complaint and an abandonment proceeding involving one railroad line, and applied the same balancing analysis to both questions. 363 I.C.C. at 703.  In another case, Utah Transit Auth. -- Line of Union Pacific R.R. Co., ICC Finance Docket No. 32186, 1993 WL 112128, at *3 (served April 14, 1993), which involved the question of whether an operating window restriction related to the sale of certain trackage rights by a carrier interfered materially with that carrier's common carrier obligations, the agency discussed the Illinois Central Gulf balancing test in dicta but specifically did not apply it or rely on it.

We deal in summary fashion with another argument cursorily made by the petitioners. The petitioners suggest that the STB also used the wrong standard because it misread the language of 49 U.S.C. § 11101. Since the statute requires a carrier to provide service upon "reasonable request," the petitioners claim "the STB should have analyzed whether the request of Granite State and [MBRR] for unrestricted access to the Guilford Line was 'reasonable.'" In context, this argument is self-defeating. First, there is nothing in the statute to indicate that the reasonableness of the request is a kind of threshold question which must be addressed in every case separately from the adequacy of the service. Second, by the time the STB issued its decision, the operating window had long been discontinued, and Guilford did in fact respond to the petitioners' demands for unrestricted access by first expanding and shifting the operating window and then abolishing the window altogether. The Board, in evaluating the reasonableness of Guilford's imposition on MBRR during that time, necessarily took into account the reasonableness of MBRR's requests in the first place. Third, if the STB had conducted such analysis, it would have been of no help to the petitioners. A finding that the request was reasonable would have changed nothing in the subsequent analysis and a finding that the request was not reasonable would have ended their claim.

-18-

The petitioners also argue that the STB should have performed the reasonableness analysis under section 10702 by specific reference to the congressional goals in the Rail Transportation Policy (RTP), codified at 49 U.S.C. § 10101. This argument is without merit. The factors that the petitioners claim should have been considered under the RTP -- that Guilford allegedly had the market power to engage in predatory practices,[14] that MBRR's service to Granite State promotes energy conservation and public health,[15] etc. -- have little to do with whether there was a safety issue and the reasonableness of the response. To the extent these considerations go to the petitioners' argument that the safety concerns were pretextual, the STB considered the arguments.

The petitioners finally argue that the STB could not itself weigh the legitimacy of the safety concerns and that it was required to refer the matter to the Federal Railroad Administration

---

[14]In connection with this argument, we note that there is evidence in the record that Granite State contacted Guilford at some point to discuss the possibility that Granite State become Guilford's customer. Guilford refused because, according to its statements, it wanted to be clear that the time restrictions were imposed out of concern for safety, not as a way to exert pressure and take over MBRR's customer. We note also that the STB took into account the risk of market power abuse in its decision. Granite State II, 2004 WL 2138195, at *4.

[15]This argument is premised in part on the fact that Granite State is prohibited from shipping the crushed stone by truck, a fact the STB acknowledged and considered. Granite State II, 2004 WL 2138195, at *4.

(FRA). See 49 U.S.C. § 103 (FRA has "duties and powers related to railroad safety"). It is true the STB has sometimes sought the benefit of the FRA's expertise. The petitioners cite National Railroad Passenger Corporation -- Weight of Rail, 4 S.T.B. 416 (1999), where the STB itself sought the FRA's expertise to resolve a technical dispute "over the appropriate weight [115-pound or 132-pound] of continuous welded rail that must be installed on a specified line in order to ensure that Amtrak will be able to operate its trains safely at speeds of up to 79 miles per hour." But the STB is not required to do so in every case. In this dispute, the STB was not faced with the task of deciding technical questions about railroad safety. The STB did not need to decide whether there was compliance with FRA safety regulations or what measures would be necessary to achieve compliance. The STB simply had to determine whether, on the record, Guilford had good reasons to be concerned about safety and whether its responses to those concerns were reasonable. As the STB correctly phrased the inquiry, "[I]t is not the Board's role to be the final arbiter of safety issues. At its core, the question before us is whether actions taken by [Guilford] were unreasonable." Granite State II, 2004 WL 2138195, at *2.

B. Were the STB's Conclusions Arbitrary or Capricious?

We start with the observation that the petitioners did convince the STB that there were restrictions imposed on them. The

-20-

dispute is over whether the STB acted arbitrarily or capriciously in concluding that, in context, Guilford had not acted unreasonably in imposing these restrictions.

The petitioners' theme throughout their brief is that the safety concerns were contrived and were used by Guilford to harm MBRR, with which it had a long history of business animosity. Even so, the STB's conclusion that there were safety concerns is reasonable. A reasonable person concerned with rail safety could easily have concluded that there were potential safety risks created by the facts here which needed to be addressed: as a matter of common sense, there was, at a minimum, the risk that the trains would roll onto Guilford's property due to the downhill grade at the point where MBRR's and Guilford's tracks meet. The addition of a new carrier on the lines meant increased usage of the tracks and raised the risks of collision. Wilton Scenic itself requested a meeting to work on coordination of the three carriers' activities. MBRR's failure to comply with the derailment device condition or to tell Guilford it would not comply exacerbated the problem of coordination.

The STB's conclusion that it was reasonable for Guilford to impose a time window to address its safety concerns is equally unassailable. It certainly was reasonable for Guilford to take steps to separate out the operation of Wilton Scenic and MBRR from its own operations, at least temporarily, while it considered the

safety implications and came up with a permanent response. Also, as the STB's brief to us argues, "[m]aintenance work windows are frequently used to close or restrict lines for several hours or even days at a time." See Golden Cat Div. of Ralston Purina Co., STB Docket No. 41550, 1996 WL 197602, at *3 (served April 25, 1996) (maintenance window of 6-8 hours per day). And exclusive operating windows have been found to be consistent with common carrier obligations under section 11101. See, e.g., N.J. Transit Corp. -- Certain Assets of Consolidated Rail Corp., 4 S.T.B. 512 (2000) (exclusive operating window from 10 p.m. to 6 p.m., six days a week, was adequate for freight carrier to meet its common carrier obligations); Utah Transit Auth. -- Line of Union Pacific R.R. Co., ICC Finance Docket No. 32186, 1993 WL 112128, at *3 (served April 14, 1993) (operating window from midnight to 5 a.m., five days a week, was adequate to meet the carrier's common carrier obligations).

The STB supportably found that Guilford was not aware of the local permitting restrictions on Granite State's hours of operation and the consequent limitation on MBRR's hours of operation. Granite State II, 2004 WL 2138195, at * 3. It was thus not unreasonable for Guilford to initially impose an operating window on MBRR from 1 a.m. to 8 a.m. When Guilford learned of the hardships created by the original window and the permitting restrictions on Granite State, it eventually, but voluntarily,

changed the window. The STB found that the new window did allow MBRR to provide "substantial service" to Granite State. Id. The STB also noted that the new window was partly instituted to allow Guilford to perform repairs on its tracks to address MBRR's complaints of poor track conditions. After the repairs were done, Guilford raised the speed limit on the line and eliminated the operating window altogether to allow MBRR to "operate over the line at any hour, as long as there is no conflict with ongoing [Guilford] services." Id.

After reviewing the entire record and the actions taken by both sides, the STB explained that it viewed the case as one where "as [Granite State]'s needs became better known to it, [Guilford] took steps to accommodate the shipper and [MBRR]." Id. To be sure, the STB also, appropriately, chastised Guilford for not responding as quickly as it could have. The STB stated that it believed that Guilford "could have moved more quickly to be responsive and work out arrangements that would meet Granite State's needs while adequately protecting [Guilford]'s interests." Id. At each step, the STB concluded, the restrictions and the subsequent accommodations, when viewed together, were not unreasonable in the circumstances. The STB concluded that Guilford's actions did result in harm to Granite State, but the harm was not the result of unreasonable, unjustified behavior.

-23-

There is ample evidence in the record to provide a rational basis for this view of the case.

C.   Remedy

The petitioners finally argue that since the STB found they were harmed by the restrictions Guilford imposed, they were entitled to damages.  Carriers are liable for damages under 49 U.S.C. § 11704(b) only if there is a violation of the relevant portions of Subtitle IV of Title 49 of the United States Code governing interstate transportation by rail (49 U.S.C. §§ 10101 et seq.).  49 U.S.C. § 11704(b) ("A rail carrier . . . is liable for damages sustained by a person as a result of an act or omission of that carrier in violation of [49 U.S.C. §§ 10101 et seq.].").  The STB supportably found that Guilford had not violated sections 11101 and 10702, and so the petitioners have no claim for damages.

**III.**

The STB's decision is **<u>affirmed</u>**, and the petition for judicial review is **<u>denied</u>**.  Costs are to be taxed against the petitioners.