# United States Court of Appeals
## For the First Circuit

No. 15-1069

DIANA DEL GROSSO;
RAY SMITH; JOSEPH HATCH; CHERYL HATCH;
KATHLEEN KELLEY; ANDREW WILKLUND; RICHARD KOSIBA,

Petitioners,

v.

SURFACE TRANSPORTATION BOARD; UNITED STATES,

Respondents,

GRAFTON & UPTON RAILROAD COMPANY,

Intervenor.

PETITION FOR REVIEW OF A FINAL ORDER OF THE SURFACE
TRANSPORTATION BOARD

Before

Torruella, Selya, and Dyk,[*]
Circuit Judges.

Mark Bobrowski, with whom Blatman, Bobrowski & Mead LLC was on brief, for petitioners.
Erik G. Light, Attorney, Surface Transportation Board, with whom William J. Baer, Assistant Attorney General, Robert B. Nicholson and Shana Marie Wallace, Attorneys, Department of Justice, Craig M. Keats, General Counsel, and Evelyn G. Kitay, Deputy General Counsel, were on brief, for respondents.
James E. Howard, with whom John A. Mavricos, Jonah M. Temple, Christopher, Hays, Wojcik & Mavricos LLP, Linda J. Morgan, and Nossaman, LLP, were on brief, for intervenor.

_____

[*]Of the Federal Circuit, sitting by designation.

October 16, 2015

**DYK, Circuit Judge**. Diana del Grosso, et al. ("petitioners") petitioned the Surface Transportation Board ("Board") for a declaratory order that state and local regulations of a facility owned by Grafton & Upton Railroad Company ("G&U") were not preempted by the Interstate Commerce Commission Termination Act ("ICCTA"), Pub L. No. 104-88, 109 Stat. 803. The Board held that state and local regulations were preempted because the facility was part of "transportation by rail carrier." 49 U.S.C. § 10501(a)(1). We affirm the Board's decision that the facility was operated by a "rail carrier." But because the Board relied on an erroneous standard in concluding that the activities at the facility were a part of "transportation," we vacate and remand.

## I.

Under the ICCTA, the Board has jurisdiction over "transportation by rail carrier." Id. Where the Board has such jurisdiction, it is exclusive. Whether or not the Board is exercising its regulatory authority over the transportation, state and local[1] laws governing such transportation are generally preempted. See id. § 10501(b) ("[T]he remedies provided under this

---

[1] In a companion case decided today, Padgett v. Surface Transportation Board, No. 14-2067, slip op. at 7 (1st Cir. Oct. 16, 2015), we confirm that preemption applies to local as well as state regulations.

part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law."); Norfolk S. Ry. Co. v. City of Alexandria, 608 F.3d 150, 157 (4th Cir. 2010); Green Mountain R.R. Corp. v. Vermont, 404 F.3d 638, 642 (2d Cir. 2005); City of Auburn v. U.S. Gov't, 154 F.3d 1025, 1030 (9th Cir. 1998); see also Borough of Riverdale — Petition for Declaratory Order, STB Finance Docket No. 33466, 1999 WL 715272, at *4 (S.T.B. Sept. 9, 1999) (preemption even where rail construction project outside Board's regulatory authority). Such preemption is not limited to state and local economic regulation of rail transportation. See N.Y. Susquehanna & W. Ry. Corp. v. Jackson, 500 F.3d 238, 252 (3d Cir. 2007); Green Mountain, 404 F.3d at 644–45; City of Auburn, 154 F.3d at 1031. But see Fla. E. Coast Ry. Co. v. City of W. Palm Beach, 266 F.3d 1324, 1337–39 (11th Cir. 2001).

In order for an activity to count as "transportation by rail carrier," it has to be both "transportation" and operated by a "rail carrier." Tex. Cent. Bus. Lines Corp. v. City of Midlothian, 669 F.3d 525, 530 (5th Cir. 2012). "Transportation" is a broad category that includes any "property, facility, instrumentality, or equipment" connected to "movement . . . by rail," as well as various "services related to that movement." 49 U.S.C. § 10102(9)(A)–(B). Whether an activity is conducted by a "rail carrier" is a case-by-case factual determination based on,

-4-

*inter alia*, how much control a rail carrier is exercising over the activity.  See Tex. Cent., 669 F.3d at 530–31 (internal quotation marks, citations omitted).  The Board routinely grants declaratory orders as to whether particular activities are preempted, but the ICCTA does not delegate to the Board the determination of whether state and local law is preempted.  See 49 U.S.C. § 10501(b).

## II.

Here, G&U is a licensed rail carrier that began operations in 1873.  It owns a railroad line that extends from North Grafton, Massachusetts, to Milford, Massachusetts.  Upton is a town located between Grafton and Milford.  In 2008, G&U decided to expand its rail yard in Upton and develop it into a rail-to-truck transloading facility.  As a part of that plan, G&U undertook to build a wood pellet facility that would receive wood pellets in bulk from hopper railcars and transfer them, after some processing and bagging, onto trucks.  G&U also entered into a Terminal Transloading Agreement with Grafton Upton Railcare LLC ("GU Railcare"), a part of Dana Companies, a group of companies with extensive experience in transloading bulk materials.  GU Railcare was neither owned nor operated by G&U.  GU Railcare was to operate the transloading services on behalf of G&U.

By the fall of 2011, G&U finished the wood pellet facility.  At the facility, a vacuum hose is attached to hopper railcars carrying wood pellets in bulk and sucks the pellets

-5-

through a system that removes dust from the pellets. The pellets are then moved to silos for temporary storage. Additional dust is then removed from the pellets, and the pellets are conveyed from the silos, placed in forty-pound bags, and stacked onto pallets, fifty bags to a pallet. The pallets are then shrink-wrapped and stored until they are loaded into trucks for final delivery to retail stores.

The Upton Board of Selectmen concluded that the activities at the facility were preempted by the ICCTA, 49 U.S.C. § 10501(b), and did not seek to regulate them. However, on August 1, 2012, petitioners, who live near the facility, sought a declaratory order from the Board that the wood pellet activities were not part of "transportation by rail carrier" under 49 U.S.C. § 10501(b) and that state and local regulations were therefore not preempted. Petitioners complained that the transloading operations caused them harms such as exposure to excess glare, light intrusion, noise, and diminution of property values, and that such harms would be prevented by enforcement of Upton's zoning by-laws, which, for example, restrict a building's height and require special permits for manufacturing facilities, which permits could limit noise and above-ground storage. See, e.g., Town of Upton Zoning By-Law, § 4.2 Table C (height restrictions); id. § 3.1.3 Table A & n.6 (special permit requirements). The petitioners mounted a two-pronged attack on the railroad's claim of preemption.

-6-

First, they argued that the wood pellet transloading operations were not "transportation" under the ICCTA because they were manufacturing activities. Second, they argued that GU Railcare was not a "rail carrier" under the statute.

With respect to the second issue, petitioners requested discovery of documents regarding the construction, financing, operation, management, and ownership of the facility in order "to determine the real relationship" between G&U, GU Railcare, and Dana Companies. On January 23, 2013, the Board initiated a declaratory order proceeding but denied the discovery request by petitioners, noting that petitioners had access to G&U's transloading agreement with GU Railcare and its lease agreement for the rail yard, and that G&U had also not explained why discovery or additional documents were needed.

On February 13, 2013, petitioners requested reconsideration of the Board's denial of discovery. Petitioners argued mainly that there was new evidence that "raises significant questions" regarding G&U. The evidence was that G&U was involved in a separate litigation with the town of Grafton, Massachusetts, over a proposed propane transloading facility,[2] and that evidence as to the relationship between G&U and the operator of the other facility could shed light on the relationship between G&U and the

---

[2] This other case is also being decided today. See Padgett v. Surface Transp. Bd., No. 14-2067, slip op. at 3 (1st Cir. Oct. 16, 2015).

Dana Companies. On May 7, 2013, the Board denied reconsideration. It concluded that the various agreements already submitted were sufficient to determine the issue of whether the activities were being conducted by a "rail carrier," noting that the Board "is guided [on that issue] by the terms of the agreements between the railroad and the transloader." It also concluded that the relationship between G&U and a third party involving a different transloading facility was not relevant.

On December 5, 2014, the Board issued a declaratory order. After concluding that the petitioner had standing to raise the preemption issue, the order declared that the Board had exclusive jurisdiction over the transloading activities in G&U's facility because they constituted "transportation" by "rail carrier." The Board concluded that the vacuuming, screening, bagging, and palletizing of the wood pellets were "transportation" and not "manufacturing" because, although those activities were "not essential" to transporting wood pellets by rail, they "facilitate[d]" such transportation by making it "more efficient." This was so because the activities allowed G&U to transport the pellets by hopper cars rather than boxcars. The Board also distinguished the activities in question from manufacturing and commercial transactions because they did not "change [the] nature of the product," even though some of the activities, such as bagging, "may produce some value to the consumer." The Board also

-8-

determined that GU Railcare was acting on behalf of G&U in performing the transloading activities, and so a "rail carrier" was doing the transporting.  It finally determined that GU Railcare was not a sham set up simply to avoid state and local regulations.

The petitioners sought judicial review.  We have jurisdiction pursuant to 28 U.S.C. § 2342.  Under the Administrative Procedure Act ("APA"), we will not set aside the Board's determinations unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or are "unsupported by substantial evidence."  See 5 U.S.C. § 706(2).  The APA requires the agency to "articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"  Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983) (quoting Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962)); see also Granite State Concrete Co. v. Surface Transp. Bd., 417 F.3d 85, 91 (1st Cir. 2005).

## III.

In this court, both the Board and the railroad argue that the Board's decision on the issue of preemption is entitled to Chevron deference.  Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837 (1984).  We disagree.

In Wyeth v. Levine, 555 U.S. 555 (2009), the Supreme Court explained that "agencies have no special authority to

pronounce on pre-emption absent delegation by Congress," noting that the Court had never "deferred to an agency's *conclusion* that state law is pre-empted."  Id. at 576-77 (emphasis in original). Rather, "[w]here . . . Congress has not authorized a federal agency to pre-empt state law directly, the weight this [c]ourt accords the agency's explanation of state law's impact on the federal scheme depends on its thoroughness, consistency, and persuasiveness"; that is, the agency's decision is entitled only to Skidmore deference. Id. at 556 (citing Skidmore v. Swift & Co., 323 U.S. 134 (1944)).

Contrary to the Board's suggestions, nothing in City of Arlington v. FCC, 133 S. Ct. 1863 (2013), undermines Wyeth.  City of Arlington concerned only whether an agency's interpretation of the scope of its jurisdiction is entitled to Chevron deference, did not even mention Wyeth, and, as the Court explicitly noted, "ha[d] nothing to do with federalism," id. at 1873, which animates the Court's preemption jurisprudence, see, e.g., Wyeth, 555 U.S. at 565; Medtronic, Inc. v. Lohr, 518 U.S. 470, 485 (1996).

Following Wyeth, the courts of appeals have been unanimous in concluding that Chevron deference does not apply to preemption decisions by federal agencies.  See Seminole Tribe of Fla. v. Stranburg, No. 14-14524, 2015 WL 5023891, at *13 (11th Cir. Aug. 26, 2015) ("[D]eference to an agency's ultimate conclusion of federal preemption is inappropriate."); Steel Inst. of N.Y. v. City of New York, 716 F.3d 31, 39-40 (2d Cir. 2013) ("We do not defer to

an agency's legal conclusion regarding preemption . . . ."); <u>In re</u> <u>Universal Serv. Fund Tel. Billing Practice Litig.</u>, 619 F.3d 1188, 1200 (10th Cir. 2010) ("An agency's conclusion that state law is preempted is not necessarily entitled to deference."); <u>see also</u> <u>St. Louis Effort for AIDS</u> v. <u>Huff</u>, 782 F.3d 1016, 1024 (8th Cir. 2015); <u>Do Sung Uhm</u> v. <u>Humana, Inc.</u>, 620 F.3d 1134, 1155–56 (9th Cir. 2010). The Fifth Circuit in <u>Franks Investment Co.</u> v. <u>Union Pacific Railroad Co.</u>, 593 F.3d 404 (5th Cir. 2010), has held in particular that <u>Chevron</u> deference to the Surface Transportation Board on the question of preemption is inappropriate, holding that "the [Board's] decision regarding the preemptive effect of the ICCTA and the test it uses to determine preemption are not binding on us." <u>Id.</u> at 413–14 (citing <u>Wyeth</u>). We agree that the Board is not entitled to <u>Chevron</u> deference on the issue of preemption.[3]

---

[3] We do not decide whether, if Congress does give express authority to an agency to determine the scope of preemption, <u>Chevron</u> deference would apply. <u>See</u> <u>Medtronic</u>, 518 U.S. at 495–96 (citing <u>Chevron</u> and giving "substantial weight" to an agency's pronouncement on a preemption issue where there was an express preemption provision in the organic statute and Congress explicitly granted agency authority to exempt state regulations from preemption); <u>see also</u> <u>City of New York</u> v. <u>FCC</u>, 486 U.S. 57, 63–64 (1988).

Here, in contrast to statutes where Congress has delegated authority to an agency to pronounce on the scope of preemption, <u>see</u> <u>Wyeth</u>, 555 U.S. at 576 n.9 (listing examples), the Board's organic statute simply states that its remedies are exclusive and have preemptive effect. <u>See</u> 49 U.S.C. § 10501(b). The Board's general authority to issue a declaratory order is derived from the APA. <u>See</u> 49 U.S.C. § 721(b)(4); 5 U.S.C. § 554(e).

This does not mean that the Board's preemption decision earns no deference. We apply Skidmore deference, which allows us to defer to the Board in so far as we find the Board's interpretations persuasive. See Merrimon v. Unum Life Ins. Co. of Am., 758 F.3d 46, 55 (1st Cir. 2014). We also defer to the Board's factual determinations, such as whether there are efficiency gains connected to the choice of railcars in transportation. Such determinations need only be supported by substantial evidence and a "'rational basis' . . . in the facts on the record." See Granite, 417 F.3d at 91-92 (citation omitted); Ross Express, Inc. v. United States, 529 F.2d 679, 681 (1st Cir. 1976).

**IV.**

The primary issue on appeal is whether the activities at the transloading facility at the conclusion of a rail journey — that is, the vacuuming, screening, bagging, and palletizing of the wood pellets — constitute rail "transportation," and thus are not subject to otherwise applicable state and local regulations.

Section 10501 of the ICCTA vests the Board with "exclusive" jurisdiction over "transportation by rail carriers" and the "construction, acquisition, operation, abandonment, or discontinuance of . . . facilities." 49 U.S.C. § 10501(b). "Transportation" covers "a . . . facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail," 49 U.S.C. § 10102(9)(A), as well as

-12-

"services related to that movement, including receipt, delivery, elevation, transfer in transit, . . . storage, handling, and interchange of passengers and property," 49 U.S.C. § 10102(9)(B).

It is well-established that the preemption of state and local regulation under the ICCTA generally extends to transloading facilities. Transloading, performed at the "starting or ending point of the rail component of the movement," New Eng. Transrail, STB Finance Docket No. 34797, 2007 WL 1989841, at *1 (S.T.B. Jun. 29, 2007), involves transferring bulk shipments from one type of vehicle to another at an interchange point. See N.Y. Susquehanna, 500 F.3d at 242 n.1. In the language of the statute, transloading typically involves "receipt, . . . storage, handling, and interchange" or "transfer in transit" of goods. 49 U.S.C. § 10102(9)(B). Such activities are generally preempted. See N.Y. Susquehanna, 500 F.3d at 247–49 (waste transloading from trucks to railcars headed to landfills); Tex. Cent., 669 F.3d at 530 (transloading of hydraulic fracking sand, including offloading sand from railcars to silos and loading onto trucks); Norfolk, 608 F.3d at 154, 158 (transfer of bulk shipments of ethanol from railcars onto surface tank trucks); Green Mountain, 404 F.3d at 640, 645 (unloading of bulk salt and cement arriving by rail to load onto trucks for local distribution or to temporarily store pending distribution).

In short, as a general matter, "intermodal transloading operations and activities involving loading and unloading materials from rail cars and temporary storage of materials" are a part of transportation. New Eng. Transrail, 2007 WL 1989841, at *6; see also, e.g., Tex. Cent., 669 F.3d at 530; Green Mountain, 404 F.3d at 642. That such transloading activities are integral to the physical movement of goods, and thus "transportation," is an "indisputable point." Tex. Cent., 669 F.3d at 530.

Petitioners argue that the activities here do not constitute traditional transloading operations, but rather constitute manufacturing, and that state and local regulations are not preempted. In its decision, the Board did not focus on whether the activities facilitated transloading of the pellets from rail to truck. Instead, the Board concluded that the transloading activities here were "transportation" because the vacuuming, screening, bagging, and palletizing of the wood pellets allowed G&U to transport the pellets in hopper railcars, which accommodate twenty more tons of pellets than boxcars. "Were these activities performed at the manufacturing facility," the Board reasoned, "the wood pellets would have to be transported in boxcars, in which case each pallet containing 50 40-pound bags would have to be blocked and braced in order to limit movement within the boxcar." That in turn "would consume space and . . . leav[e] less capacity for the wood pellets themselves."

-14-

We think that the Board's efficiency rationale goes beyond the statute and is beside the point. While "transportation" is "an extremely broad category," Pejepscot Indus. Park, Inc. v. Me. Cent. R.R. Co., 215 F.3d 195, 199 (1st Cir. 2000), not all activities connected with rail transportation are considered "transportation" under the statute. The definition of "transportation" in the statute, "[w]hile certainly expansive, . . . does not encompass everything touching on railroads." Emerson v. Kan. City S. Ry. Co., 503 F.3d 1126, 1129 (10th Cir. 2007). Thus, "manufacturing and commercial transactions that occur on property owned by a railroad that are not part of or integral to the provision of rail service are not embraced within the term 'transportation.'" New Eng. Transrail, 2007 WL 1989841, at *6. In particular, the ICCTA does not preempt all state and local regulation of activities that has any efficiency-increasing relationship to rail transportation. Rather, Subsection (A) of the definition "focuses on *physical* instrumentalities 'related to the movement of passengers or property,'" while Subsection (B) focuses on "'services related to *that* movement.'" Emerson, 503 F.3d at 1129-30 (emphases added) (quoting 49 U.S.C. § 10102(9)). The statute is clear on its face that the preempted activities are all related to the physical movement of "passengers or property."

Here, the proper focus of the Board should have been on the question of whether the activities — vacuuming, screening,

-15-

bagging, and palletizing — facilitated the physical movement of "passengers or property" (here the transfer of the pellets from rail to truck), rather than cost efficiency.  The questionable nature of the Board's rationale is revealed by a simple example. Under the Board's rationale, the transloading facility would be exempt from regulation if it had been constructed and operated by the rail carrier at the ultimate destination at a retail store. Under the Board's reasoning, the retail facility would be exempt because postponing the bagging and other operations would have made it feasible to transport the pellets more efficiently in hopper cars.  We think that sweeps too far.  The Board's efficiency rationale would result in a vast regulatory gap in which state and local regulation would be eliminated simply because the facilities were economically connected to rail transportation.[4]

Courts and the Board have rejected interpretations of "transportation" that go beyond facilitating the movement of "passengers or property."  In New England Transrail, the Board held that state and local regulation of shredding of construction debris that had arrived at a transloading facility from trucks — before

---

[4]     Nor would the Board be able to regulate such facilities. See Joint Petition for Declaratory Order — Bos. & Me. Corp. & Town of Ayer, MA, STB Finance Docket No. 33971, 2001 WL 458685, at *4 (S.T.B. Apr. 30, 2001) ("Railroads are not required to obtain Board approval . . . to build or expand facilities that are ancillary to a railroad's operations unless the activity is part of a larger project subject to our jurisdiction (such as construction of a new rail line).").

being loaded onto railcars — was not preempted because such activity did not constitute "transportation."  This was so because the shredding was not necessary to load the debris onto railcars.  See New Eng. Transrail, 2007 WL 1989841, at *9-10 (noting that "a shredder is *not required* to pack into rail cars" the debris that had arrived from trucks. (emphasis added)).  In Emerson, 503 F.3d at 1129-32, the Tenth Circuit similarly rejected an interpretation of "transportation" that would preempt state tort law governing a railroad's dumping of old railroad ties into a wastewater drainage ditch.  The court held that the dumping did not relate to "movement of passengers or property" under the ICCTA, 503 F.3d at 1130, and the interpretation would entail the Board's jurisdiction over the railroad's dumping a "dilapidated engine in the middle of Main Street" simply because "disposing of unneeded railroad equipment [would be] cost-conscious," id. at 1132.  Here, the Board's interpretation is defective because it fails to relate the wood pellet facility's activities to the physical "movement of passengers or property,"  as opposed to cost efficiency.

New England Transrail is not to the contrary.  The Board held that baling and wrapping of solid waste arriving at a transloading facility from trucks constituted "transportation," noting that such baling and wrapping "permits a wider variety of rail cars to be used." New Eng. Transrail, 2007 WL 1989841, at *9.  But there preemption was appropriate because the baling and

-17-

wrapping was necessary to transload the waste from trucks to railcars. The Board expressly found that "baling and wrapping are not the sort of activities that would have value for any other purpose."[5] Id. Here, while the wood pellets are being transloaded from railcars onto trucks, there has been no Board finding that the vacuuming, screening, bagging, and palletizing facilitated the loading of the pellets onto the trucks.

Under these circumstances, a remand is required to determine whether the vacuuming, screening, bagging, and palletizing facilitated the transloading of the pellets from the railcars to the trucks or was done solely for another, unrelated purpose.

**V.**

Two collateral issues remain. First, petitioners contend that the Board erred in not considering the facility's "re-pelletization" of the wood pellets. Re-pelletization, a process which, according to G&U, began around December 2012, involves screening broken pellets from unbroken pellets, pressing them together into new pellets, and moving the new pellets into silos for storage. Petitioners argue that such a process, because it transforms the nature of the product, constitutes manufacturing and

---

[5] While the fact that the activity adds value to the consumer (or the railroad) does not bar it from being transportation, it is equally clear that merely adding value does not support a claim that the activity is transportation. See New Eng. Transrail, 2007 WL 1989841, at *10.

-18-

not rail transportation.  But whether or not it does constitute manufacturing — a matter on which we take no view — petitioners did not raise this issue before the Board, and it is thus not properly before us.  See Commonwealth of Mass., Dep't of Pub. Welfare v. Sec'y of Agric., 984 F.2d 514, 523 (1st Cir. 1993) ("In the usual administrative law case, a court ought not to consider points which are not seasonably raised before the agency." (citing United States v. L.A. Trucker Truck Lines, Inc., 344 U.S. 33, 37 (1952))). However, we do not preclude the Board from considering this issue on remand.

Second, while petitioners do not ask for judicial review of the Board's determination that G&U was operating the facility and that GU Railcare was acting on behalf of G&U in performing the transloading activities, they do argue that the Board erred in denying discovery, which they claim was necessary to determine whether the transloading activities were being performed by a "rail carrier."  We see no error.

We generally do not intervene in a lower tribunal's discovery order unless it was plainly wrong and resulted in substantial prejudice to the aggrieved party.  See Modern Cont'l/Obayashi v. Occupational Safety & Health Review Comm'n, 196 F.3d 274, 281 (1st Cir. 1999) (appellate court will "intervene in such matters only upon a clear showing of manifest injustice, that is, where the lower court's discovery order was plainly wrong and

resulted in substantial prejudice to the aggrieved party" (citation omitted)); see also Trailways Lines, Inc. v. Interstate Commerce Comm'n., 766 F.2d 1537, 1546 (D.C. Cir. 1985) ("[T]he conduct and extent of discovery in agency proceedings is a matter ordinarily entrusted to the expert agency in the first instance and will not, barring the most extraordinary circumstances, warrant the Draconian sanction of overturning a reasoned agency decision.").

As petitioners seem to concede, the Board's regulations permit discovery "regarding any matter, not privileged, which is relevant to the subject matter involved in a [Board] proceeding," 49 C.F.R. § 1114.21(a)(1), but they do not require such discovery, id. ("Parties *may* obtain discovery . . . ." (emphasis added)). Any such discovery must still be "relevant to the subject matter involved," id., and the Board need not order discovery "where the dispute involves a legal issue and where the record is sufficient to resolve the controversy without discovery." Md. Transit Admin. — Petition for Declaratory Order, STB Finance Docket No. 34975, 2008 WL 4281987, at *5 (S.T.B. Sept. 17, 2008). Here, other than petitioners' initial barebones request for discovery to determine the "real" relationship between G&U, GU Railcare, and Dana Companies, petitioners failed to show a need for any specific documents. The Board concluded that the transloading agreement and the lease would suffice to determine whether the relationship between GU Railcare and G&U was such that the transloading

activities were being performed by a "rail carrier" and that G&U's involvement in a litigation with separate parties involving separate contracts was not relevant evidence to reopen its discovery decision.  In this proceeding, petitioners fail to explain why any of this is incorrect, let alone why the Board's decision resulted in manifest injustice.  There is no basis to set aside the Board's decision that the activities in question were conducted by a "rail carrier."

CONCLUSION

We vacate and remand for further proceedings consistent with this opinion.

**VACATED AND REMANDED**

All parties shall bear their own costs.