# United States Court of Appeals
## For the First Circuit

No. 14-2067

BROOK A. PADGETT;
CRAIG DAUPHINAIS; JENNIFER THOMAS; BRUCE W. SPINNEY,
AS THEY ARE MEMBERS OF THE BOARD OF SELECTMEN OF THE
TOWN OF GRAFTON,

Petitioners,

v.

SURFACE TRANSPORTATION BOARD; UNITED STATES,

Respondents,

GRAFTON & UPTON RAILROAD COMPANY,

Intervenor.

---

PETITION FOR REVIEW OF A FINAL ORDER OF
THE SURFACE TRANSPORTATION BOARD

---

Before

Torruella, Selya, and Dyk,[*]
<u>Circuit Judges</u>.

---

<u>Ginny Sinkel Kremer</u>, Grafton Town Counsel, with whom <u>Blatman, Bobrowski & Mead, LLC</u>, were on brief, for petitioners.
<u>Charles H.P. Vance</u>, Attorney, Surface Transportation Board, with whom <u>William J. Baer</u>, Assistant Attorney General, <u>Robert B. Nicholson</u> and <u>Shana Marie Wallace</u>, Attorneys, Department of Justice, <u>Craig M. Keats</u>, General Counsel, and <u>Evelyn G. Kitay</u>, Deputy General Counsel, were on brief, for respondents.
<u>John A. Mavricos</u>, with whom <u>Jonah M. Temple</u>, <u>Christopher, Hays, Wojcik & Mavricos, LLP</u>, <u>James E. Howard</u>, <u>Linda J. Morgan</u>, and <u>Nossaman, LLP</u>, were on brief, for intervenor.
<u>David F. Hassett</u> and <u>Hassett & Donnelly, P.C.</u>, on brief for

---

[*]Of the Federal Circuit, sitting by designation.

Congressman James P. McGovern, amicus curiae in support of petitioners.

Jonathan S. Springer and Springer Law Office, PLLC, on brief for Propane Gas Association of New England, amicus curiae in support of respondents and intervenor.

———————————————

October 16, 2015

———————————————

**DYK, Circuit Judge**.  The Town of Grafton (the "Town" or "Grafton") petitions for judicial review a declaratory order of the Surface Transportation Board ("Board") finding that 49 U.S.C. § 10501(b) preempts state and local regulations with respect to Grafton & Upton Railroad Company's ("G&U") liquid petroleum gas transloading facility (the "facility").  We deny the petition.

**I.**

As described in a companion case decided today, <u>Del Grosso</u> v. <u>Surface Transportation Board</u>, No. 15-1069, slip op. at 3 (1st Cir. Oct. 16, 2015), under the Interstate Commerce Commission Termination Act ("ICCTA"), Pub. L. No. 104-88, 109 Stat. 803, "the Board has jurisdiction over transportation by rail carrier."  49 U.S.C. § 10501(a)(1); <u>see also</u> <u>Fayard</u> v. <u>Ne. Vehicle Servs., LLC</u>, 533 F.3d 42, 46 (1st Cir. 2008).  This jurisdiction is exclusive, and the ICCTA preempts "State law" governing "regulation of rail transportation":

> The jurisdiction of the Board over—(1) transportation by rail carriers . . . and facilities of such carriers; and (2) the construction, acquisition, operation . . . of . . . facilities, even if the tracks are located, or intended to be located, entirely in one State, is exclusive.  Except as otherwise provided in this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law.

49 U.S.C. § 10501(b). The question here is whether state and local regulation of G&U's propane (or liquid petroleum gas) transloading facility is preempted.

**II.**

G&U owns and operates a rail line extending approximately sixteen miles between a CSX Transportation, Inc. ("CSXT") line in North Grafton, Massachusetts, and another CSXT line in Milford, Massachusetts. In January 2012, G&U purchased a parcel of land in North Grafton, located immediately adjacent to its rail line and existing rail yard and within a "Water Supply Protection Overlay District" under the Town's zoning regulations. G&U plans to construct a transloading facility on the parcel for transferring propane received by tank car in North Grafton to storage tanks and then to trucks for delivery across New England. In December 2012, G&U notified the Town of its intent to deliver four 80,000-gallon propane storage tanks to its rail yard to be used in constructing the facility. In response, the Town issued a cease and desist order requiring G&U to halt construction and filed a complaint in Massachusetts state court seeking to bar the construction, arguing that construction of the facility would violate state and local law.

The state and local laws at issue are zoning and permitting regulations. Massachusetts law provides that "[n]o person shall construct, maintain or use any tank or container of

-4-

more than ten thousand gallons' capacity, for the storage of any fluid other than water, unless the same is located underground, without first securing a permit."  Mass. Gen. Laws ch. 148, § 37. The Grafton Zoning By-Law ("ZBL") lists the following as "specifically prohibited" uses: "Storage, transport or sale of petroleum or other refined petroleum products in quantities greater than normally associated with household use . . . ."  ZBL § 7.4.C.9.  The Town's zoning regulations also require a "special permit" for "any use involving secondary usage or storage of toxic or hazardous materials in quantities greater than normally associated with household use" and for "underground fuel or other storage tanks, including any tanks or collection pits."  ZBL § 7.4.D.1; id. § 7.4.D.7.  G&U argued that these state and local regulations were preempted and removed the case to federal district court.  That court determined it lacked jurisdiction and remanded the case back to the state court.

On June 12, 2013, the state court enjoined the delivery of the storage tanks, directed G&U to file a petition for a declaratory order with the Board to determine whether § 10501(b) preempts the application of state and local zoning and permitting ordinances, and stayed the state court proceedings pending the outcome of the Board proceeding.  G&U filed a petition with the Board on July 24, 2013, and the Board instituted a declaratory order proceeding on January 24, 2014.

Before the Board, the Town argued that G&U's activities did not constitute transportation by rail carrier because of the involvement of several companies (the "Propane Companies") with which G&U had previously contracted for the financing, construction, and operation of the facility. The Town's theory was that the facility would be constructed and operated by the Propane Companies (not rail carriers) rather than by G&U (a rail carrier). In a September 17, 2014, decision, the Board found that the state storage tank permit requirement and the Town's ordinances were preempted by § 10501(b) because G&U's construction and operation of the facility constituted "transportation by rail carrier." 49 U.S.C. § 10501(a). The Board concluded, based on G&U's July 2013 termination of the agreements with the Propane Companies, that G&U "can and will hire the people with the necessary expertise to properly operate the facility on its own" and that the record adequately demonstrated that the facility will be an integral part of G&U's operations as a rail carrier. The Board further found that state fire safety and construction codes would still apply to the construction and operation of the facility as long as they were applied in a non-discriminatory manner. The Board concluded by stating that "[t]his action will not significantly affect either the quality of the human environment or the conservation of energy resources."

The Town petitions for judicial review. We have jurisdiction over final orders of the Board pursuant to 28 U.S.C. § 2342. See Citizens Awareness Network, Inc. v. United States, 391 F.3d 338, 346 (1st Cir. 2004). Under the Administrative Procedure Act, a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). The Board's decision is not arbitrary or capricious if there is a "rational basis" for the decision based on facts in the record. Granite State Concrete Co. v. Surface Transp. Bd., 417 F.3d 85, 91-92 (1st Cir. 2005) (citation omitted). In the companion to this case, we established that we do not give Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837 (1984), deference to the Board's determination of preemption, but we do give Skidmore v. Swift & Co., 323 U.S. 134 (1944), deference, and we defer to the Board's factual findings. See Del Grosso, slip op. at 11.

## III.

At the outset the Town argues that the ICCTA preempts only state and not local regulation. This argument is meritless. The ICCTA's use of "State" clearly encompasses both state and local law. See Atl. Coast Line R.R. Co. v. City of Goldsboro, 232 U.S. 548, 555 (1914) ("A municipal by-law or ordinance, enacted by virtue of power for that purpose delegated by the legislature of

-7-

the state, is a state law within the meaning of the Federal Constitution."); see also City of Saint Louis v. Paprotnik, 485 U.S. 112, 125 (1988) ("[S]tate law . . . may include valid local ordinances and regulations . . . ."). Otherwise, the express preemption of state law would be completely ineffective. It is well established that the ICCTA preempts local as well as state regulation. See, e.g., Tex. Cent. Bus. Lines Corp. v. City of Midlothian, 669 F.3d 525, 530 (5th Cir. 2012) ("Congress intended to preempt state *and local* laws that come within the Board's jurisdiction." (emphasis added)); Norfolk S. Ry. Co. v. City of Alexandria, 608 F.3d 150, 160 (4th Cir. 2010) (city ordinances preempted by ICCTA); City of Auburn v. U.S. Gov't, 154 F.3d 1025, 1031 (9th Cir. 1998) ("We believe the congressional intent to preempt this kind of state *and local* regulation of rail lines is explicit in the plain language of the ICCTA and the statutory framework surrounding it." (emphasis added)).

"Determining whether the ICCTA preempts a state or local law is a two-step inquiry. First, the law must seek to regulate 'transportation,'"[2] and "second, that transportation must be

---

[2] The ICCTA broadly defines "transportation" to include a "facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail," and "services related to that movement, including receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, and interchange of passengers and property." 49 U.S.C. § 10102(9). The facility here provides "storage, handling, and interchange of . . . property," id., and therefore clearly satisfies the first step of the § 10501(b) inquiry. See Green

-8-

conducted 'by a rail carrier.'" Tex. Cent., 669 F.3d at 530; see also, e.g., Norfolk, 608 F.3d at 157–58; Fla. E. Coast Ry. Co. v. City of W. Palm Beach, 266 F.3d 1324, 1331 (11th Cir. 2001). "Whether a particular activity constitutes transportation *by rail carrier* under section 10501(b) is a case-by-case, fact specific determination" based on a series of factors including "(1) whether the rail carrier holds out transloading as part of its business, (2) the degree of control retained by the [rail] carrier, (3) property rights and maintenance obligations, (4) contractual liability, and (5) financing." Tex. Cent., 669 F.3d at 530–31 (internal quotation marks, citations omitted).

The Town challenges the Board's finding that the facility constituted transportation by rail carrier because G&U failed to establish that it would actually operate the facility. But there is no basis for reversing the Board's finding that G&U would operate the proposed facility. The Board properly relied on evidence submitted by G&U, including the relevant contracts and termination agreements with the Propane Companies, and verified statements from G&U's fire safety consultant, G&U's president and CEO, and G&U's vice president of business development. There is no

---

Mountain R.R. Corp. v. Vermont, 404 F.3d 638, 642 (2d Cir. 2005) ("Certainly, the plain language [of the ICCTA] grants the Transportation Board wide authority over the transloading and storage facilities undertaken by Green Mountain."); see also N.Y. Susquehanna & W. Ry. Corp. v. Jackson, 500 F.3d 238, 248 (3d Cir. 2007).

evidence that G&U lacked the ability to finance, construct, and operate the facility without the significant involvement of third parties. We appropriately defer to the Board's factual findings. See Del Grosso, slip op. at 12. Whatever role the presumption against preemption may play in the analysis under the statute, we are confident it does not have the effect of overcoming deference to the Board's factual findings.

Alternatively, the Town argues that the Board erred in denying discovery on whether the facility was operated by G&U. While Board regulations allow parties to obtain discovery "regarding any matter, not privileged, which is relevant to the subject matter involved in a proceeding," 49 C.F.R. § 1114.21(a)(1), the Town neither sought discovery from G&U nor filed a motion to compel such discovery. Understandably, the Board did not address this discovery issue. In any event, the Town has not shown that such discovery was necessary, given the Town's access to the relevant contractual documents. See Del Grosso, slip op. at 19. The mere fact that G&U reorganized its operations to shift responsibility for the financing and operation of the facility from the Propane Companies to itself is not a basis for discovery.

## IV.

While regulation of railroad transloading facilities is generally preempted by the ICCTA, Del Grosso, slip op. at 3, the

10

Town belatedly argues that preemption is not applicable to health and safety regulations. In this connection, it relies on the presumption against preemption and the general rule that traditional police power regulation is not preempted. See, e.g., Norfolk, 608 F.3d at 158-60 & n.12; Green Mountain, 404 F.3d at 643. But as the Town acknowledges, "[t]he issue before the [Board] was whether G&U had demonstrated that the proposal as set forth would constitute 'transportation' undertaken 'by a rail carrier' within the meaning of § 10501(b)." The Town did not raise before the Board the argument that the ICCTA did not preempt health and safety regulations.[3]

The failure to raise an argument before an agency constitutes a waiver of that argument on judicial review. See Lopez v. Holder, 740 F.3d 207, 211 n.4 (1st Cir. 2014) ("[W]e are barred from considering [arguments] because they were not presented to the agency."); Mazariegos-Paiz v. Holder, 734 F.3d 57, 62 (1st Cir. 2013) ("Were the court free to delve into the merits of issues not presented to the agency, it would effectively usurp the

---

[3] The Town argues that it raised the presumption against preemption argument before the Board, relying on a brief reference in a proposed ruling of law that had been submitted to the district court and was attached to the Town's reply brief before the Board. But the phrase "presumption against preemption" appears nowhere in the Town's briefing before the Board, and this single reference in a filing to another court attached as an exhibit to a reply brief is insufficient to "forcefully present[]" an argument for agency consideration. Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc., 435 U.S. 519, 553-54 (1978).

agency's function."); see also Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc., 435 U.S. 519, 553–54 (1978) (requiring arguments be presented to an agency in a manner that is not "cryptic and obscure"). Because the Town failed properly to raise the health and safety argument before the agency, we decline to address it for the first time.

**V.**

The Town also argues, for the first time in this proceeding, that the Board violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 et seq., by failing to conduct any analysis of the environmental aspect of its decision. NEPA applies to "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). This court has summarized NEPA's requirements as follows:

> [NEPA] obligates agencies . . . to evaluate the environmental impacts of its proposed actions. To comply with NEPA, the [agency is] first required to determine whether [the proposed project] would have a significant environmental impact. A detailed environmental impact statement ("EIS") is required whenever proposed actions will "significantly affect the quality of the human environment." If uncertain about impact, the agency may start with a less detailed Environmental Assessment ("EA"). If the EA finds a significant impact, a full EIS must be prepared; if not, the agency makes a "Finding of No Significant Impact" ("FONSI"), which exhausts its obligation under NEPA.

Sierra Club v. Wagner, 555 F.3d 21, 24 (1st Cir. 2009) (citations omitted). The Town argues that NEPA applies here because the Board's preemption decision constitutes a "major Federal action,"

12

as G&U could not construct the facility absent the Board's preemption determination. According to the Town, the Board's statement that "[t]his action will not significantly affect either the quality of the human environment or the conservation of energy resources" constitutes a FONSI, which was produced without the preparation of an Environmental Assessment, in violation of NEPA. The Board responds that NEPA is inapplicable because the declaratory order here is not a "major Federal action," as neither federal funding nor Board licensing was involved, relying on this court's holding that the test for major federal action under NEPA is "whether federal approval is the prerequisite to the action taken by the private actors and whether the federal agency possesses some form of authority over the outcome." Mayaquezanos por la Salud y el Ambiente v. United States, 198 F.3d 297, 302 (1st Cir. 1999).

The Board is correct that NEPA does not apply to its declaratory order, because the order was not a "major Federal action" under 42 U.S.C. § 4332(C). The Board made a legal determination concerning preemption of the Town's zoning and permitting ordinances. The Board did not provide federal funds, approve or license the transload facility, or otherwise manifest "indicia of control" over G&U that would be sufficient to establish a "major Federal action." Mayaquezanos, 198 F.3d at 302. Moreover, declaratory orders are categorically exempted from

13

environmental documentation requirements under the Board's NEPA regulations absent "extraordinary circumstances." 49 C.F.R. § 1105.6(c) ("No environmental documentation will normally be prepared . . . for the following actions . . . (iii) [d]eclaratory orders . . . ."). The petitioners have failed to demonstrate any "extraordinary circumstances" that could overcome the categorical exemption. 40 C.F.R. § 1508.4. Therefore, petitioners have not established that the Board violated NEPA.

We note, however, that since the Board's view is that such declaratory orders are not subject to NEPA, there is no reason for its gratuitous statement, apparently a "standard environmental disclaimer . . . found in virtually all [Board] decisions," about the lack of an environmental impact. Such boilerplate disclaimers do nothing but foster confusion.

**PETITION DENIED**

Costs to respondents and intervenor.