# United States Court of Appeals
## For the First Circuit

No. 17-1794

DIANA DEL GROSSO;
RAY SMITH; JOSEPH HATCH; CHERYL HATCH;
KATHLEEN KELLEY; ANDREW WILKLUND; RICHARD KOSIBA,

Petitioners,

v.

SURFACE TRANSPORTATION BOARD; UNITED STATES,

Respondents,

GRAFTON & UPTON RAILROAD COMPANY,

Intervenor.

PETITION FOR REVIEW OF A FINAL ORDER OF
THE SURFACE TRANSPORTATION BOARD

Before

Torruella, Thompson, and Kayatta,
<u>Circuit Judges</u>.

Mark Bobrowski, with whom Blatman, Bobrowski & Haverty, LLC was on brief, for petitioners.
Erik G. Light, Attorney, Surface Transportation Board, with whom Makan Delrahim, Assistant Attorney General, Robert B. Nicholson and Adam D. Chandler, Attorneys, Department of Justice, Craig M. Keats, General Counsel, and Theodore L. Hunt, Associate General Counsel, were on brief, for respondents.
James E. Howard for intervenor.

August 6, 2018

**THOMPSON**, <u>Circuit Judge</u>.

**Preface**

This dispute — back here a second time[1] — takes us once again into the arcane world of the Interstate Commerce Commission Termination Act ("ICCTA").  The combatants are the same.  On one side of the controversy are petitioners Diana Del Grosso, Ray Smith, Joseph Hatch, Cheryl Hatch, Kathleen Kelley, Andrew Wilklund, and Richard Kosiba (collectively "petitioners").  On the other side are respondents Surface Transportation Board ("STB") and the United States, as well as intervenor Grafton & Upton Railroad Company ("G&U").[2]  Petitioners believe the STB went off track by concluding that certain activities at a G&U facility involving wood pellets — vacuuming, screening, repelletizing, bagging, palletizing, and shrink-wrapping (more on those later) — qualify as "transportation by rail carrier" and so fall within the STB's exclusive jurisdiction.[3]  Respondents and intervenor take

---

[1] <u>See</u> <u>Del Grosso</u> v. <u>Surface Transp. Bd.</u>, 804 F.3d 110 (1st Cir. 2015) ("<u>Del Grosso I</u>").

[2] We apologize for all the acronyms, but they are par for the course in cases like this one.  <u>See, e.g.</u>, <u>Del Grosso I</u>, 804 F.3d at 113.

[3] For anyone wondering, "palletizing" means to load "freight" on a pallet base "for efficient shipping and handling."  <u>See</u> *Palletize*, Free Dictionary, https://www.thefreedictionary.com/palletize (last visited July 6, 2018).  "Shrink-wrapping" means "[t]o wrap (an article of merchandise) in protective clear plastic film."  <u>See</u> *Shrink-wrap*, Free Dictionary, http://www.thefreedictionary.com/shrink-wrap (last visited July 6, 2018).  And "repelletizing" means "[t]o form

the exact opposite position, unsurprisingly.  Disagreeing with petitioners and agreeing with respondents and intervenor, we deny the petition for review.

## ICCTA

We begin by cluing the reader in on the key aspects of the ICCTA.

Passed in 1995 to terminate the Interstate Commerce Commission, the ICCTA gives the STB — an independent federal agency — exclusive jurisdiction over "transportation by rail carrier . . . in the United States between a place in . . . a State and a place in the same or another State as part of the interstate rail network."  See 49 U.S.C. § 10501(a)(1), (a)(2)(A), and (b); see also Del Grosso I, 804 F.3d at 113-14.  Federal regulation of railroads is "pervasive and comprehensive."  Chi. & N.W. Transp. Co. v. Kalo Brick & Tile Co., 450 U.S. 311, 318 (1981).  But it does have its limits — for instance, the STB's jurisdiction does not extend to purely intrastate rail networks.

The ICCTA defines "transportation" broadly to encompass both the facilities and equipment "related to the movement of passengers or property, or both, by rail" as well as "services related to that movement."  49 U.S.C. § 10102(9)(A) and (B).

into pellets again."  See *Repellet*, Wiktionary, https://en.wiktionary.org/wiki/repellet (last visited July 6, 2018).

Examples of "services related to that movement . . . include[] receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, and interchange of passengers and property."  Id. § 10102(9)(B); see also Del Grosso I, 804 F.3d at 117-18.  Of course, the use of the word "include" indicates the list is illustrative rather than comprehensive.  See United States v. Cianci, 378 F.3d 71, 79 (1st Cir. 2004); see also *Include*, Black's Law Dictionary 880 (10th ed. 2014).

But — and it's a big but — while the definition of transportation is "expansive," it most certainly "does not encompass everything touching on railroads."  Del Grosso I, 804 F.3d at 118 (quoting Emerson v. Kan. City S. Ry. Co., 503 F.3d 1126, 1129 (10th Cir. 2007)).  So, for example, "'manufacturing and commercial transactions that occur on property owned by a railroad that are not part of or integral to the provision of rail service are not embraced within the term "transportation."'"  Id. (quoting New Eng. Transrail, LLC, d/b/a Wilmington & Woburn Terminal Ry. — Constr., Acquisition & Operation Exemption — in Wilmington & Woburn, MA, STB Finance Docket No. 34797, 2007 WL 1989841, at *6 (S.T.B. June 29, 2007) ("New Eng. Transrail")).  Ultimately, though, whether an activity amounts to transportation "is a case-by-case, fact-specific determination."  Padgett v. Surface Transp. Bd., 804 F.3d 103, 108 (1st Cir. 2015) (quoting

Tex. Cent. Bus. Lines Corp. v. City of Midlothian, 669 F.3d 525, 530 (5th Cir. 2012)).

If the STB has jurisdiction, the next question usually is whether that jurisdiction preempts state and local regulation, given the facts of the case. See Del Grosso I, 804 F.3d at 113-14; Padgett, 804 F.3d at 107-08. But making our job easier, petitioners — as the STB notes, without contradiction — did not and do not dispute that if the challenged activities come within the STB's jurisdiction, then the ICCTA would preempt the application of various local ordinances to those activities.

Against this legal landscape, we turn to the particulars of petitioners' case. In so doing, we borrow generously from our earlier opinion.

**Case Background**

The relevant facts are simple and uncontroversial. We offer only a summary, knowing that anyone wanting more details can consult our prior decision.

*G&U's Facility*

In the late 2000s, G&U redeveloped its rail yard (located in Upton, Massachusetts) and an adjoining tract of land (formerly used as a municipal landfill) into a rail-to-truck transloading

facility.[4]  Since then, G&U has used that facility to transload a variety of bulk commodities, including wood pellets.

*Wood Pellets*

Other countries use wood pellets as fuel in power plants. But New Englanders use them as home-heating fuel in wood-burning stoves.  Manufacturers make wood pellets from raw materials like small logs, wood chips, and saw dust.  They chip, dry, pulverize, and steam the materials, and then press them through dies to form uniformed pellets.[5]  After cooling, they screen the newly-formed pellets to remove dust and broken pieces, material known as "fines," which they recycle into new pellets by repeating the just-described manufacturing process.  And when the pellets are ready for shipping, they contain only a tiny amount of fines — typically less than 1% of the total shipment.

Of all the wood pellets shipped to G&U's facility for transloading, the vast majority are made by two companies:  Georgia Biomass, LLC, located in Georgia, and Pinnacle Renewable Energy

---

[4] "Transloading, performed at the 'starting or ending point of the rail component of the movement,' involves transferring bulk shipments from one type of vehicle to another at an interchange point." Del Grosso I, 804 F.3d at 118 (citation omitted) (quoting New Eng. Transrail, 2007 WL 1989841, at *1).

[5] "A die," to quote Wikipedia, "is a specialized tool used in manufacturing industries to cut or shape material mostly using a press."  See *Die (manufacturing)*, Wikipedia, https://en.wikipedia.org/wiki/Die_(manufacturing) (last visited July 6, 2018).

- 7 -

("Pinnacle"), located in British Columbia. Operating the largest pellet-manufacturing facility in the United States, Georgia Biomass produces roughly 750,000 metric tons of pellets a year. Pinnacle operates 7 pellet-manufacturing plants and can produce about 1,500,000 metric tons of pellets a year. Georgia Biomass sells its pellets in bulk only. It has no facilities for bagging them. And it ships them by rail in hopper cars[6] — the use of rail-hopper cars results in fewer pellets breaking than if the pellets had been shipped by rail or truck in bags. Pinnacle sells only about 1% of its pellets in bags. And it ships these bagged pellets only short distances to places in the Pacific Northwest. The pellets shipped to G&U's facility come not in bags but in bulk in rail-hopper cars.

G&U's customers are wood-pellet distributors who, after buying the wood pellets from the manufacturers, sell the pellets either to retailers or to homeowners. As the pellets' owners, the distributors pay the rail-freight charges plus the transloading charges. The distributors have no facilities in New England where they can take the bulk-form pellets by rail, place them in bags, and put them on pallets for distribution by truck. Perhaps not surprisingly, the distributors' customers — residential pellet

---

[6] "A hopper car," Wikipedia tells us, "is a type of railroad freight car used to transport loose bulk commodities." See *Hopper car*, Wikipedia, https://en.wikipedia.org/wiki/Hopper_car (last visited July 6, 2018).

users, one and all — also have no ability to receive the pellets in bulk form.

An unfortunate fact is that some wood pellets get damaged during the long rail journey from their place of manufacture to G&U's facility. The normal handling of hopper cars at switching yards across the country, not to mention the vibration and pounding of these cars moving over many thousands of miles of track, causes some pellets to deteriorate or break into smaller pieces. Roughly 5% to 10% of the wood pellets arrive at G&U's facility broken, primarily because of the rail-transportation process. Also, the friction between pellets caused by the jostling of the railcars creates dust. Both are problems because broken pellets and dust can damage wood-burning stoves.

Hoping to undo the damage caused by the rail movement, G&U came up with a specific regimen. Attaching a vacuum hose to the arriving hopper cars, G&U sucks the pellets and extracts the dust. It discards the dust as waste. Using a screen, it separates the broken and unbroken pellets. Then it re-presses the broken pellets into whole pellets (*i.e.*, it "repelletizes" them); places all the pellets in 40-pound bags; stacks 50 bags to a pallet; shrink-wraps the pallets to keep out moisture; and moves the pallets to a staging area — there they remain until loaded onto flatbed trucks or trailer vans (sent by the pellet distributors) for delivery to retail stores. G&U, however, does not have the

type of chipping, drying, pulverizing, or steaming gizmos that Georgia Pacific and Pinnacle have.

*Prior Proceedings*

The Upton board of selectmen concluded that the ICCTA preempted local regulation of the wood-pellet activities at G&U's facility. Unwilling to take this lying down, petitioners — all of whom live near the facility — asked the STB for a declaratory order that these activities are not part of "transportation by rail carrier" under ICCTA because they are "manufacturing" activities. So, they continued, there can be no federal preemption of any otherwise-applicable state and local regulations. G&U opposed the petition, naturally.

For its part, the STB ruled that the vacuuming, screening, bagging, and palletizing constitute "transportation" rather than "manufacturing" since they "facilitate" the "rail transportation" of the pellets "by making it more efficient." The STB thought this because these activities allow the pellets to be sent to G&U in bulk in hopper cars rather than in bags on pallets in box cars — a process that allows more pellets to be shipped at one time. The STB also distinguished the challenged activities from manufacturing by insisting they did not "change the nature or physical composition of the commodity being transported." The STB said nothing about repelletizing and shrink-wrapping, however.

Reviewing the STB's decision, we ruled in our initial decision that "the ICCTA does not preempt all state and local regulation of activities that has any efficiency-increasing relationship to rail transportation." Del Grosso I, 804 F.3d at 118-19. On the contrary, the statute, we noted, "focuses on *physical* instrumentalities related to the movement of passengers or property" and "on services related to *that* movement." Id. at 119 (internal quotation marks omitted). So, we stressed, the ICCTA "is clear on its face that the preempted activities are all related to the physical movement of 'passengers or property.'" Id. And based on that understanding, we held that the STB should have focused on "whether the activities — vacuuming, screening, bagging, and palletizing — facilitated the physical movement of 'passengers or property' (here the transfer of the pellets from rail to truck)," instead of zeroing in on "cost efficiency" (for simplicity we'll generally call this the "Del Grosso I test"). Id. We thus remanded for the STB "to determine whether the vacuuming, screening, bagging, and palletizing facilitated the transloading of the pellets from the railcars to the trucks or was done solely for another, unrelated purpose." Id. at 120. And even though petitioners did not raise the repelletization process before the STB, we said the STB could rule on that activity on remand too. Id.

Back before the STB, petitioners argued that six of G&U's activities — vacuuming, screening, repelletizing, bagging, palletizing, and shrink-wrapping — are not "integral to the physical movement" of wood pellets.[7] Rather, petitioners insisted, these activities are simply part of the "manufacturing" process, and thus "subject to local zoning regulations." Focusing especially on repelletizing, they asserted that the pressing together of broken pellets is nothing if not manufacturing — a process that "add[s] value" because without it the broken pieces would be thrown away instead of re-formed into whole pellets. Before G&U got its hands on the pellets, the argument went, they "were in bulk and inaccessible to the retail market" — but after G&U finished with the "screening, vacuuming, repelletizing, bagging, palletizing and shrink-wrapping," the pellets "are a different product."

Responding, G&U asserted that the contested activities are part of transportation because "they are absolutely essential to the physical transfer of the pellets from rail-hopper cars to

_____

[7] This appears to be the first time petitioners targeted the shrink-wrapping. But neither respondents nor intervenor makes anything of this — for example, neither says petitioners failed to timely raise the shrink-wrapping issue before the STB. Cf. Del Grosso I, 804 F.3d at 120 (noting that "court[s] ought not to consider points which are not seasonably raised before the agency" (quoting Commonwealth of Mass., Dep't of Pub. Welfare v. Sec'y of Agric., 984 F.2d 514, 523 (1st Cir. 1993)). Following their lead, we say no more about how they raised the shrink-wrapping claim.

the trucks provided by the distributors."  "Manufacturing," G&U noted, "is a complicated, capital-intensive process that includes collecting and processing raw materials, hammering and drying raw materials, forming pellets and recycling dust and pieces not fully formed" — a process vastly different from what goes on at G&U facility, since all it is doing is "restor[ing] broken pellets to the size they were when the completed pellets left the manufacturer."  And G&U likened its "work . . . to . . . spot repairs that might be made on freight that is delivered damaged," because it addresses the dust-and-broken-pellets problem caused by the rail movement.

The STB sided with G&U, ruling in an extensive decision that the complained-about activities "qualified as 'transportation'" under the ICCTA and thus fell within the STB's jurisdiction.  We just hit the decision's highlights here.

Homing in on the word "facilitate" in the Del Grosso I test, the STB noted that "'[f]acilitate,'" according to the dictionary, "means 'to make easier' or 'to help bring about.'"[8] From there, the STB turned to bagging, palletizing, and shrink-wrapping and found that "[w]hen the pellets arrive in bulk in rail hopper cars" at G&U's facility, "they cannot be directly transloaded into the trucks" sent "to pick them up."  So, as the

---

[8] Petitioners do not dispute that these are the commonly-accepted meanings of "facilitate."

- 13 -

STB saw it, these services satisfy the Del Grosso I test because they "facilitate" the transfer of pellets by "mak[ing] it easier to load the pellets onto the trucks." Also based on the evidence presented to it, the STB determined that "[t]hese activities . . . are not 'done solely for another, unrelated purpose.'"

Adopting a belt-and-suspenders strategy, the STB ruled that "the bagging, palletizing, and shrink-wrapping of the bagged pellets at" G&U's facility "also come within the [STB's] jurisdiction because the statutory definition of 'transportation' broadly includes 'handling' and other 'services related to (rail) movement.'" An online dictionary, the STB explained, defines "'[h]andling'" as the "'coordination and integration of operations such as un-packing, re-packing, packaging, and movement of materials or goods over short distances.'" Bagging is packaging, the STB ruled. And palletizing and shrink-wrapping "are also steps in the 'handling' process" at G&U's facility because they "facilitate" the loading of the bagged pellets onto trucks.

Switching to vacuuming, screening, and repelletizing, the STB concluded that "they remedy damage caused by [rail] movement" — which makes them "'services . . . related to' the rail transportation of the pellets" and so "part of 'transportation' under" the ICCTA. These services "do not constitute wood pellet manufacturing," the STB stressed, in a passage worth quoting at length (citation omitted):

- 14 -

As the record shows, beginning with wood, wood chips, and sawdust, the manufacturing process for the wood pellets at issue here involves chipping the wood into small uniform pieces and combining them with wood chips and sawdust; drying the material to a uniform moisture content; pulverizing the wood into a uniform fiber mass; steaming the fiber mass; and pressing the material through a die to form uniform sized pellets. In contrast, G&U performs no chipping, drying, pulverizing, or steaming. It presses broken pellets, not pulverized fiber material, through a die.

And while "both G&U and the manufacturers screen and vacuum the pellets," the STB added, "G&U's operation is intended not to create new pellets but merely to restore broken pellets to the size they were when they left the manufacturer."

One STB-board member concurred with everything in the decision except the repelletizing analysis. And on that matter, she found "it difficult to conclude that pressing broken pieces of wood through a die is 'part of rail transportation.'" She also thought that the record did not adequately show that the dust-and-broken-pellets problem "necessarily results" from the movement of the pellets by rail. And she thought that her colleagues "spot repair" approach gives rail carriers too much leeway to claim preemption.

Displeased with the STB's decision, petitioners now petition us for review.

## Standard of Review

Obligated to follow the standard of review set out in our earlier opinion, we note the following points. We can jettison

- 15 -

the STB's "determinations" only if "they are 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law,' or are 'unsupported by substantial evidence.'" See Del Grosso I, 804 F.3d at 116 (quoting 5 U.S.C. § 706(2)). Of course, we cannot call the STB's decision arbitrary and capricious if the record reflects "a 'rational basis' for the decision." Granite State Concrete Co. v. Surface Transp. Bd., 417 F.3d 85, 91-92 (1st Cir. 2005); see also Padgett, 804 F.3d at 107. So we check to see whether the STB considered the relevant factors or committed a clear error of judgment, knowing we cannot replace the STB's judgment with our own. See Granite State Concrete Co., 417 F.3d at 92. And we give the STB's position — that the contested activities come within its exclusive jurisdiction over "transportation by rail carrier" — deference comparable to its persuasive force. See Del Grosso I, 804 F.3d at 117 (discussing Skidmore v. Swift & Co., 323 U.S. 134 (1944)).

With the standard of review in place, we now explain why we cannot nix the STB's decision.

### Bagging, Palletizing, and Shrink-Wrapping

Sufficient evidence supports the STB's conclusion that bagging, palletizing, and shrink-wrapping make it easier to transload the wood pellets from railcars to trucks. The pellets, remember, are shipped not in bags but in bulk form via rail-hopper cars. And when they get to G&U's facility, they *cannot* be directly

- 16 -

transloaded onto the distributors' flatbed trucks and trailer vans. Rather, to pick them up, the distributors need the pellets to be in bags on shrink-wrapped pallets — remember, too, that the distributors have no New England facilities where they can receive the pellets by rail in bulk and then get them in bags and on pallets for transport. Also, our review of the record gives us no bases to reject the STB's ruling that bagging, palletizing, and shrink-wrapping are not done solely for a purpose unrelated to the transloading process.

Petitioners offer a host of reasons why we should conclude otherwise. But none persuades us.

Kicking things off, petitioners blast the STB for not following a supposed instruction from us "to examine whether the transloading of the wood pellets at the [G&U] facility is 'integral to the physical movement of goods'" — a quote lifted from their brief (they filed no reply brief, by the way). But Del Grosso I made crystal clear what the STB had to do on remand — namely, to decide if the complained-about activities "*facilitated* the transloading of the pellets from the railcars to the trucks or was done solely for another, unrelated purpose." See 804 F.3d at 120 (emphasis added). This wording tracked our earlier statement that, given our understanding of the ICCTA, the STB should have focused "on the question of whether the activities . . . *facilitated* the physical movement of 'passengers or property' (here the transfer

- 17 -

of the pellets from rail to truck), rather than cost efficiency."
Id. at 119 (emphasis added). Anyhow, the STB followed our command
to a T. Petitioners criticize the STB for taking our "remand order
. . . quite literally." But the STB doubtless did as it should
have done. See Tang v. State of R.I., Dep't of Elderly Affairs,
163 F.3d 7, 10 (1st Cir. 1998) (noting generally how those on the
receiving end of a remand order must follow the order).

To be fair, Del Grosso I did note that "as a general
matter, 'intermodal transloading operations and activities
involving loading and unloading materials from railcars and
temporary storage of materials' are a part of transportation," 804
F.3d at 118 (quoting New Eng. Transrail, 2007 WL 1989841, at *6),
and "[t]hat such transloading activities are integral to the
physical movement of goods, and thus 'transportation,' is an
'indisputable point,'" id. (quoting Tex. Cent. Business Lines
Corp., 669 F.3d at 530). Del Grosso I was simply confirming that
intermodal transloading is integral to and thus part of
transportation, not telling the STB to do anything other than to
see if the contested activities at G&U's facility facilitate the
physical transfer of pellets.

Anyway, even if we assume for argument's sake that the
STB had to focus on the "integral" issue, we note the STB did find
(at least implicitly) that these activities are "'integrally
related' to rail transportation." We say this because the STB

- 18 -

noted that "(a)n activity may be integrally related to rail transportation if it *facilitates* rail transportation even if it is not absolutely essential for the cargo to be transported by rail" (quotation marks removed and emphasis added) — a point the STB made right after it said the contested activities facilitate the transloading of pellets from railcars to trucks.

Taking another tack, petitioners suggest that bagging, palletizing, and shrink-wrapping are "manufacturing" activities, not "rail transportation" activities.  And they think this is so because, in their view, these undertakings "change the nature or physical composition of the pellets shipped in bulk."  We think not.  Tellingly, petitioners cite no record evidence to support their "change the nature or physical composition of the pellets" thesis, probably because the record reveals that G&U adds nothing to the pellets themselves during these activities.  Petitioners make much of the fact that a G&U witness's business plan described the fought-over activities as part of the "manufacturing process." But the STB found more persuasive multiple verified statements from wood-pellet manufacturers cutting against that view.[9]  And petitioners give us no convincing reason to believe the STB blundered in doing so.

---

[9] A verified statement from one manufacturer, for example, explains that "[t]he manufacturing process has been fully completed . . . when the pellets leave" the manufacturing facility.

Hold on, say petitioners. Bagging, palletizing, and shrink-wrapping "add value" by facilitating the retail sale of pellets — a fact that prevents these activities from coming within the transportation rubric, or so they argue. All we need say, however, is that Del Grosso I flatly rejected their position, noting that "the fact that the activity adds value to the consumer (or the railroad) does not bar it from being transportation." See 804 F.3d at 120 n.5.

Undeterred, petitioners insist that bagging, palletizing, and shrink-wrapping can be (and often are) done outside a rail facility. To hear them tell it, the pellets — which come in by rail-hopper cars — can "easily be shipped" from G&U's facility to the distributors in hopper trucks rather than in flatbed trucks. And, their argument goes, once the pellets are at these non-rail-carrier facilities, the distributors can bag, palletize, and shrink-wrap them. But even putting aside that the distributors here do not have the ability to receive pellets in bulk form, bag them, and put them on pallets, we think petitioners are out of luck. And that is because some activities done at non-rail-carrier facilities can — in the right situation — be part of rail transportation when done at a rail-carrier facility. See id. at 118 (quoting 49 U.S.C. § 10102(9)). Take, for instance, storage. The ICCTA includes storage in its non-exhaustive list of transportation services, meaning storage is part of rail

transportation if — in the ICCTA's words — it is "related to" the rail movement of the goods at issue. Yet storage is performed at many non-rail-carrier facilities. Consequently, this argument, like their others, is a no-go.

If more were needed — and it most certainly is not — G&U's bagging, palletizing, and shrink-wrapping are part of "transportation" for a second, independent reason: they constitute "handling," commonly defined (as the STB noted and petitioners do not dispute) as the "[c]oordination and integration of operations such as un-packing, re-packing, packaging, and movement of materials or goods over short distances." See *Handling*, BusinessDictionary.com, http://www.businessdictionary.com/definition/handling.html (last visited July 6, 2018). Bagging is a form of packaging, obviously. Palletizing and shrink-wrapping the bagged pellets are additional forms of packaging. And these activities help in loading the wood pellets onto the trucks as well. Cf. generally S. Pac. Terminal Co. v. Interstate Commerce Comm'n, 219 U.S. 498, 526-27 (1911) (holding that the sacking of ground cotton seed meal — following rail movement and before loading onto ships for export — was an incident of the "transshipment" of the product subject to the agency's regulation as part of interstate commerce). As best we can tell, petitioners' only response to this conclusion is that these undertakings constitute manufacturing — and so, the theory

continues, they cannot constitute handling. But our rejection of petitioners' manufacturing theory kiboshes this argument too.

The bottom line is we cannot say the STB erred in deciding that bagging, palletizing, and shrink-wrapping fit within the ICCTA's broad definition of "transportation," either because the activities meet the <u>Del Grosso I</u> test (since they facilitate transloading of the pellets from railcars to trucks, and are not done solely for another unrelated purpose) or because the activities are part of the "handling" of property at a rail facility.

### Vacuuming, Screening, and Repelletizing

Nor can we say the STB erred in ruling that vacuuming, screening, and repelletizing come within the ICCTA's expansive definition of "transportation" because they are "related to" the movement of property by rail. Here is why.

As we noted a few pages ago, transportation in ICCTA-speak covers not only "the movement of . . . property . . . by rail," <u>see</u> 49 U.S.C. § 10102(9)(A), but also "services *related to* that movement," <u>see</u> <u>id.</u> § 10102(9)(B) (emphasis added).[10]   The

---

[10] "The ordinary meaning of" the phrase "'relat[ed] to'" is, according to the Supreme Court, "a broad one — 'to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with.'" <u>Morales</u> v. <u>Trans World Airlines, Inc.</u>, 504 U.S. 374, 383 (1992) (quoting the fifth edition of <u>Black's Law Dictionary</u>); <u>see also</u> *Related*, <u>Black's Law Dictionary</u> at 1479 (explaining that "related" means "[c]onnected in some way; having a relationship to or with something else").

- 22 -

record here shows that after being manufactured but before being shipped, less than 1% of the wood pellets are broken. That number jumps to 5% to 10%, however, by the time the pellets pull into G&U's facility — an increase that comes primarily because of the rail transportation. And it is this damage that the vacuuming, screening, and repelletizing rectifies — first by separating out the broken pellets and dust (vacuuming and screening) and then by putting the broken pellets back into the condition they were in before they left the manufacturers in railcars (repelletizing). In other words, then, the evidence backs up the STB's finding that G&U performed these services to remedy the damage to the pellets resulting principally from the rail movement — all of which means that these activities are "related to" the rail transportation of pellets.

Still hoping for a different result, petitioners make several arguments. But none is a difference-maker.

Petitioners first argue that vacuuming, screening, and repelletizing are part of the manufacturing — and not transportation — process because they "add value" and produce "a different product from that arriving" at G&U's facility "in bulk." But as we already said, their add-value argument goes nowhere given Del Grosso I's instruction that "the fact that the activity adds value to the consumer (or the railroad) does not bar it from being transportation." See 804 F.3d at 120 n.5. And these services do

not *create* a new product — rather, they restore the product to its original condition.

Ever persistent, petitioners say that surely G&U's *repelletizing* is manufacturing because the manufacturers also repelletize when making pellets. This argument is not without force. But it is ultimately unsuccessful. For starters, G&U's repelletizing differs significantly from the manufacturers', at least according to this record. The manufacturers' repelletizing involves recycling broken pellets, dust, and incompletely-manufactured pellets by adding them to the raw materials — which, as part of the recycling process, they then hammer, dry, steam, and once again press through dies. G&U's repelletizing, contrastingly, involves pressing already-manufactured-but-broken pellets back together through a die. G&U does not recycle broken pellets or dust (it throws the dust out, recall), because it lacks the equipment needed to hammer, dry, and steam the materials. And G&U repelletizes for a reason different than the manufacturers. The manufacturers (we again note, as a matter of helpful repetition) repelletize to complete the manufacturing process. But G&U repelletizes to remedy problems (dust and broken pellets) to the already-completed pellets — problems chiefly caused by the movement of pellets by rail (as we have been at pains to stress).

Relatedly, petitioners observe that "the repair of transported items is not included in the statutory list of services

'related to' the movement of passengers or property by rail." But to say again what we said above, the ICCTA defines what transportation "includes" — so the list is representative, not exclusive. See, e.g., Cianci, 378 F.3d at 79. Which knocks the legs out from under this aspect of petitioners' argument.

Petitioners also imply that G&U did not adequately show that rail movement caused the broken pellets and dust. We disagree. A careful reader of this opinion will now know by heart that less than 1% of pellets shipped by the manufacturers are busted, but that about 5% to 10% are damaged when they get to G&U's facility — a headache, according to the record, principally brought about by the rail transportation. Petitioners highlight no evidence to the contrary. Nor do they suggest a different cause for the dust-and-broken-pellet problem.

Lastly, petitioners advance a slippery-slope argument, complaining that if repelletizing is deemed related to rail movement, then other less-related services might be deemed related to rail movement too. Not so, we say. The STB's decision about what constitutes transportation "is a case-by-case, fact-specific determination." Padgett, 804 F.3d at 108 (quoting Tex. Cent. Bus. Lines Corp., 669 F.3d at 530). And we can review any future STB ruling on its own terms. But this ruling passes muster.

## Final Words

Because petitioners have not shown that the STB acted arbitrarily or capriciously, abused its discretion, or otherwise infracted the law, we reject their petition for review.

*Petition denied.  Costs to respondents and intervenor*.